RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0248p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CHRISTOPHER J. PAGAN,

*Plaintiff-Appellant,*

*v.*

No. 04-4414

POLICE CHIEF MATT FRUCHEY and THE VILLAGE OF GLENDALE, OHIO,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 03-00541—Sandra S. Beckwith, Chief District Judge.

Argued: December 6, 2006

Decided and Filed: June 29, 2007

Before: BOGGS, Chief Judge; MARTIN, SILER, BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Jeff Rowes, INSTITUTE FOR JUSTICE, Arlington, Virginia, for Appellant. John W. Hust, SCHROEDER, MAUNDRELL, BARBIERE & POWERS, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Jeff Rowes, INSTITUTE FOR JUSTICE, Arlington, Virginia, William H. Mellor, INSTITUTE FOR JUSTICE, Washington, D.C., for Appellant. John W. Hust, Lawrence Edward Barbiere, SCHROEDER, MAUNDRELL, BARBIERE & POWERS, Cincinnati, Ohio, for Appellees.

GIBBONS, J., delivered the opinion of the court, in which BOGGS, C. J., MARTIN, DAUGHTREY, MOORE, COLE, CLAY, and GILMAN, JJ., joined. ROGERS, J. (pp. 12-25), delivered a separate dissenting opinion, in which SILER, BATCHELDER, SUTTON, COOK, McKEAGUE, and GRIFFIN, JJ., joined.

---

## OPINION

---

JULIA SMITH GIBBONS, Circuit Judge. Plaintiff-appellant Christopher J. Pagan filed the instant suit against the Village of Glendale, Ohio ("Glendale" or "the Village") and Glendale Police Chief Matt Fruchey, alleging that section 76.06 of the Glendale Traffic Code constitutes an

unconstitutional restriction on commercial speech in violation of the First Amendment.  Following the parties' cross-motions for summary judgment, the district court determined that Glendale's ordinance complied with the requirements of *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), and granted summary judgment in favor of the defendants.  Because we conclude that the defendants have failed to produce evidence that justifies the restrictions on commercial speech imposed by the ordinance, we reverse the decision of the district court and remand for further proceedings consistent with this opinion.[1]

I.

Pagan is a resident of Glendale and formerly the owner of a 1970 Mercury Cougar that he wanted to sell.  After a classified advertisement elicited an inadequate response, Pagan posted a "For Sale" sign on the vehicle and left it parked on the public street in front of his residence.  Pagan elected to place the car on the street instead of his driveway because his driveway abuts an unimproved alley and not a public roadway.

An officer with the Glendale Police Department noticed the sign, notified Pagan that the sign was a violation of Glendale Traffic Code § 76.06, and asked him to remove it or face being cited for a municipal violation.  Section 76.06 reads as follows:

> It shall be unlawful for any person to stand or park any vehicle, motorized or towed, upon any public or private street, road, or highway within the village or upon any unimproved privately owned area within the village for the purpose of:
>
> (A) Displaying it for sale, except that a homeowner may display a motor vehicle, motorized or towed, for sale only when owned and titled to said homeowner and/or a member of said household, and only when parked upon an improved driveway or apron upon the owner's private property;
> (B) Washing, maintaining or repairing such vehicle except repairs necessitated by an emergency.
> (C) Any advertising.

Pagan corresponded with various Glendale officials, including Fruchey, but was ultimately unsuccessful in obtaining a satisfactory resolution of his dispute with the Village.  In order to avoid a citation, Pagan removed the sign from his vehicle.

Pagan subsequently filed this lawsuit against Fruchey and Glendale, alleging a violation of his constitutional rights and challenging subsections (A) and (C) of the ordinance.  Pagan's original complaint contained requests both for injunctive relief and damages, but  Pagan voluntarily withdrew his request for an injunction.  Both before the district court and before us on appeal, Pagan has argued that subsections 76.06(A) and (C) constitute impermissible restrictions on his right to engage in protected commercial speech.[2]  Following the parties' cross-motions for summary

---

[1]The district court, in its order granting summary judgment in favor of the defendants, determined that Chief Fruchey was entitled to qualified immunity.  Having failed to challenge this aspect of the district court's order in his briefing, Pagan has waived any argument that the district court's decision respecting Chief Fruchey was incorrect.  *See, e.g.*, *McCalvin v. Yukins,* 444 F.3d 713, 723 (6th Cir. 2006) ("It is well established that issues not raised by an appellant in its opening brief . . . are deemed waived.").  Therefore, we need not review the merits of this aspect of the district court's decision.

[2]The dissent determines that Pagan has waived any claim that subsection (C) of the Glendale ordinance is unconstitutional.  The subsection (C) claim was referred to in the complaint as an equal protection and due process claim.  In his summary judgment motion Pagan withdrew his equal protection claim and said that Glendale's enforcement of the advertising prohibition contained in subsection (C) was better addressed as a part of his First Amendment claim.

judgment, the district court determined that section 76.06 was a constitutional regulation of commercial speech under the Supreme Court's *Central Hudson* framework and granted summary judgment to the defendants. Pagan subsequently appealed.

II.

This court reviews the grant of summary judgment *de novo*. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Summary judgment will be affirmed if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). If, on the other hand, "a reasonable jury could return a verdict for the non-moving party," summary judgment for the moving party is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing the district court's decision, this court draws all justifiable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

While other forms of expression are entitled to more protection under the First Amendment than is commercial speech, *see, e.g., Republican Party of Minn. v. White*, 536 U.S. 765, 775 (2002) (noting that content-based restrictions on the political speech of candidates for office are subject to strict scrutiny), the protection provided to commercial speech is nevertheless considerable. The Supreme Court has outlined a four-part test that subjects restrictions on commercial speech to a form of intermediate scrutiny. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980).[3] Under the first prong of the *Central Hudson* test, the commercial speech at issue must concern lawful activities and not be misleading, thus entitling it to First Amendment protection. 447 U.S. at 563-64. If the speech is entitled to protection, the remaining prongs of the *Central Hudson* test provide the framework for determining the validity of the restriction. More specifically, a restriction on protected commercial speech will be upheld if the government "assert[s] a substantial interest in support of its regulation," "demonstrate[s] that the restriction on commercial speech directly and materially advances that interest[,]" and draws the regulation narrowly. *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 624 (1995); *see also Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002). These requirements form the second, third, and fourth prongs of the *Central Hudson* test. On each point, the government bears the burden of establishing the constitutionality of its regulatory scheme. *Bd. of Trustees of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (noting that "the State bears the burden of justifying its restrictions").

The parties agree that the speech at issue in this case, the posting of "For Sale" signs on cars, is protected commercial speech. Furthermore, Pagan takes no issue with the substantiality of Glendale's asserted regulatory interests: traffic/pedestrian safety and aesthetic concerns. Thus, the questions before us are whether Glendale has established (1) that the restriction directly and materially advances its regulatory interests and (2) that it has drawn the restriction narrowly.

---

Although Pagan did not make further specific mention of subsection (C) in his briefing, we conclude that this does not amount to waiver under the circumstances present here. Pagan's overall claim is and has been that Glendale unconstitutionally limits the posting of "For Sale" signs on cars in the public streets. In any event, although the distinction between subsections (A) and (C) was the subject of considerable questioning at oral argument, the issue of whether the conduct for which Pagan seeks First Amendment protection is reached by subsection (A), subsection (C), or both, is ultimately not germane to the resolution of Pagan's "as applied" challenge–a circumstance that likely explains Pagan's failure to distinguish between the subsections in his briefing.

[3]Defendants do not concede that the ordinance is properly viewed as a restriction on commercial speech and make an alternative argument that it is properly analyzed as a content-neutral time, place, and manner restriction. We disagree and explain our reasoning in Part IV of this opinion.

A.

With respect to the third *Central Hudson* prong, whether the speech regulation advances the government's asserted interests in a direct and material way, the Supreme Court has further explained:

> Under *Central Hudson* . . . , the State must demonstrate that the challenged regulation advances the Government's interest in a direct and material way.  That burden, we have explained, is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.

*Fla. Bar*, 515 U.S. at 625-26 (internal citations and quotation marks omitted); *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993)).  Thus, the government must come forward with some quantum of evidence, beyond its own belief in the necessity for regulation, that the harms it seeks to remedy are concrete and that its regulatory regime advances the stated goals.  *See Edenfield*, 507 U.S. at 770-72.

B.

Under the fourth *Central Hudson* prong, the relevant question is whether the speech restriction is narrowly tailored; that is, we must determine whether the speech restriction at issue is "more extensive than is necessary to serve [the asserted] interests." *Thompson*, 535 U.S. at 367 (quoting *Cent. Hudson*, 447 U.S. at 566).  The tailoring inquiry does not require a "least restrictive means" analysis. *Lorillard Tobacco*, 533 U.S. at 556.  Instead, there must be a "reasonable fit between the legislature's ends and the means chosen to accomplish those ends, . . . a means narrowly tailored to achieve the desired objective." *Id.* (internal quotation marks omitted).  The tailoring prong allows the reviewing court to assure itself that the government has "carefully calculated the costs and benefits associated with the burden on speech imposed" by regulation. *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 (1993) (internal quotation marks omitted).

III.

At the outset, we note appellees' suggestion that subsection (A) of the ordinance does not implicate the First Amendment because it prohibits the act of parking a vehicle on Glendale's roadways for the purpose of displaying it for sale.  As a result, appellees contend, the ordinance regulates commercial activity and not speech.  Under appellees' construction, a seller's chosen means of advertising a desire to sell (*e.g.*, posting a "For Sale" sign, placing a classified ad, advertising online, etc.) is irrelevant.  The act of placing a car on the street for the purpose of displaying it for sale purportedly violates subsection (A).  Appellees' argument on this point is not well taken.  During argument, they conceded that Glendale has no interest in enforcing subsection (A), except in those instances where the potential seller has displayed a "For Sale" sign.  Thus, even if we construed the literal language of subsection (A) as not implicating the First Amendment, Glendale concedes that it enforces the ordinance in a manner that does.  In this case, subsections (A) and (C) reach the same conduct,[4] and we must determine whether or not Glendale has constitutionally prohibited the posting of "For Sale" signs on cars parked in its streets.

---

[4] To be sure, subsection (C) is broader than subsection (A) and doubtless reaches speech not prohibited by (A).  As applied to Pagan's "For Sale" sign, however, both provisions prohibit its display.

A.

In arguing that appellees have not met their burden under the third *Central Hudson* prong, Pagan relies heavily on the Supreme Court's decision in *Edenfield v. Fane*, 507 U.S. 761 (1993). Pagan argues that the affidavit of Fruchey, the only evidence provided by the appellees in support of section 76.06, fails to discharge appellees' burden under *Edenfield.* We agree.

In *Edenfield*, Scott Fane, a CPA, challenged a Florida rule that prevented public accountants from engaging in direct, uninvited solicitation of potential clients. 507 U.S. at 763-64. Applying *Central Hudson*, the Court first noted that the speech at issue was protected and that the government had articulated substantial interests to justify the speech restrictions at issue. *Id.* at 768-70.

As to the third *Central Hudson* inquiry, the Court held that the state failed to carry its burden. According to the Court, while fraud prevention and professional ethics constitute substantial governmental interests, the absence of any evidence–statistical, anecdotal, or otherwise–to suggest that the speech at issue posed any threat of concrete harm to those interests caused the regulation to fail. *Id.* at 771-72. The Court characterized the state's evidence as follows:

> The only suggestion that a ban on solicitation might help prevent fraud and overreaching or preserve CPA independence is the affidavit of Louis Dooner, which contains nothing more than a series of conclusory statements that add little if anything to the Board's original statement of its justifications.

*Id.* at 772. In the absence of evidence of real harm, the state could not show that its speech restriction had any connection to furthering its asserted regulatory interests. *See id.* Thus, *Central Hudson* requires more from the government than bald assertions that a particular speech restriction serves its articulated interests.

Upon review of the record, it is clear that the evidence adduced by the appellees is insufficient to satisfy their burden under *Central Hudson*. The relevant portion of the Fruchey affidavit reads in its entirety as follows:

> The primary purpose of the Ordinance is to promote the goal of traffic safety within the Village of Glendale. The objective of the Ordinance is to prohibit attractions or activities which will induce people to come into the roadway who are not a part of normal vehicular or pedestrian traffic, such as individuals washing or repairing their cars which are parked on the street, or individuals who are looking over a motor vehicle which is displaying a for sale sign parked on the street. In addition . . ., the Ordinance also addresses aesthetic objectives of the Village of Glendale.

The Fruchey affidavit amounts to nothing more that a conclusory articulation of governmental interests. While it suffices for the second part of the *Central Hudson* test by identifying two substantial government interests, it fails to address the third prong at all: that is, how the particular restriction chosen by Glendale directly and materially advances those interests. Its reference to people in the roadway looking at cars displaying "For Sale" signs is most accurately characterized as simple conjecture by the police chief about something that might occur. Certainly, it is not evidence that "For Sale" signs on cars in streets pose any concrete harm to traffic or aesthetics or that the ordinance has any connection to the interests Glendale asserts. In fact, the Fruchey affidavit is of exactly the type deemed insufficient by the Supreme Court in *Edenfield.*

In addressing this issue, the district court incorrectly applied a deferential standard and ultimately held that Pagan had not pointed to anything in the record that would suggest that Glendale's belief that section 76.06 was needed to further its asserted interests was "unreasonable" or "palpably false." The court, relying upon *Railway Express Agency, Inc. v. New York*, 336 U.S.

106 (1949), improperly placed the burden on Pagan to demonstrate the unconstitutionality of the ordinance. *Railway Express* has no applicability in the present case. Decided over twenty-five years before the Supreme Court recognized that commercial speech is entitled to First Amendment protection, *Railway Express* examines the constitutionality of a City of New York ordinance prohibiting operation of advertising vehicles on the streets under the due process and equal protection clauses of the Fourteenth Amendment and applies a rational basis test. The case is simply irrelevant in the context of intermediate scrutiny, to which we subject restrictions on commercial speech. *See, e.g, Fox*, 492 U.S. at 480.

The issue before us is narrow in scope. This is not a question of the quality of the evidence supporting a speech regulation. It is the absence of any evidence of the need for regulation that is fatal to section 76.06. Appellees suggest that it would be difficult, expensive, and time-consuming to conduct studies and provide empirical evidence in support of section 76.06. However, the Supreme Court has made quite clear that the evidentiary requirement the state must meet under intermediate scrutiny does not prescribe the manner by which evidence must be gathered or the precise form that it must take.[5]

Instead of actual evidence of harm, appellees ask us to adopt a standard of "obviousness" or "common sense," under which we uphold a speech regulation in the absence of evidence of concrete harm so long as common sense clearly indicates that a particular speech regulation will directly advance the government's asserted interest. The difficulty with this proposition, however, is that the standard established by the Supreme Court depends neither on obviousness nor common sense. *Edenfield* requires *some* evidence to establish that a speech regulation addresses actual harms with some basis in fact.[6]

The thrust of appellees' arguments is not that the Fruchey affidavit is the type of evidence required by *Edenfield* but rather that other Supreme Court authority relieves them from the obligation of meeting the *Edenfield* requirements as to how a governmental entity must meet its burden under *Central Hudson*. They present three versions of this general argument.

First, appellees say that even in the absence of evidence of concrete harm, we should defer to legislative judgments on matters of traffic safety and aesthetics. Appellees argue that *Metromedia v. City of San Diego*, 453 U.S. 490 (1981), demands deferential review of speech regulations promulgated in vindication of traffic safety and aesthetic interests. In their view, because the Supreme Court found that San Diego's rule banning offsite billboard advertising–supported by both

---

[5]While our task is not to suggest what sort of evidence might suffice in other cases, we observe that there are many types of evidence other than expensive or burdensome studies that would likely demonstrate that a restriction responds to a real, existing problem rather than a hypothetical one. As the Supreme Court noted in *Florida Bar*, case law does not "require that empirical data come to us accompanied by a surfeit of background information." 515 U.S. at 628. What is required is a showing of a "concrete, nonspeculative harm." *Id*. at 629. Fruchey's affidavit is the sort of speculation that might just as well be offered by a person unconnected with the Village about the rationale for the ordinance.

[6]In applying *Edenfield*, the Supreme Court has observed that there are situations in First Amendment contexts other than commercial speech where the articulated harm is so obvious that no evidence is required: "[I]n other First Amendment contexts, we have permitted litigants to justify speech restrictions . . . based solely on history, consensus, and simple common sense." *Fla. Bar*, 515 U.S. at 628 (citing *Burson v. Freeman*, 504 U.S. 191, 211 (1992)).

However, the alleged harms recited by the appellees cannot be characterized as matters upon which there is longstanding consensus or upon which all can agree. Prospective buyers may be just as likely to exercise caution and avoid entering traffic when viewing cars parked in the street with "For Sale" signs as they are to enter the roadway, or owners may remove a car from the street for inspection, fearing inspecting buyers might wander into traffic. Also undercutting the notion that these harms derive from common sense and consensus is the likelihood that a "For Sale" sign a few feet off the street in a driveway creates a distraction as great as a "For Sale"sign in a street.

traffic safety and aesthetic concerns–was permissible under *Central Hudson*, the "For Sale" sign ban addressing the same concerns must also be permissible.

But *Metromedia* does not control the outcome of this case. After noting the difficulty of applying broad First Amendment principles to "unique forms of expression," *id.* at 500, the *Metromedia* plurality stated, "[e]ach method of communicating ideas is a law unto itself and that law must reflect the differing natures, values, abuses and dangers of each method. We deal here with the law of billboards." *Id.* at 501 (internal citations and quotation marks omitted). The plurality recited at some length the Court's many summary rulings upholding billboard restrictions, referred to the history of billboards, and generally emphasized the frequency with which governments had placed restrictions on billboards. The plurality ultimately concluded, "[w]e likewise hesitate to disagree with the accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety." *Id.* at 509. Thus, *Metromedia* looked to its own substitute for the sort of evidence *Edenfield* requires–the collective judgment of many legislative and judicial decisionmakers. No similar substitute exists here.[7] The record before us demonstrates no comparable legislative or judicial history supporting the conclusion that restrictions placed on "For Sale" signs posted on vehicles address concrete harms or materially advance a governmental interest.[8]

The position advocated by the appellees assumes, without discussion, that billboards and "For Sale" signs posted on parked cars raise practically indistinguishable aesthetic and traffic safety issues. Appellees' analogy hardly strikes us as obvious. In fact, it appears to sidestep the ultimate issue: namely, whether or not the speech Glendale seeks to regulate poses the harms that all agree would justify regulation. If "For Sale" signs are a threat to the physical safety of Glendale's citizens or implicate aesthetic concerns, it seems no great burden to require Glendale to come forward with some evidence of the threat or the particular concerns. Our research has revealed only one other case, post-*Edenfield*, that has ruled on this precise issue, and that court arrived at a result identical to ours on the issue of the evidence required by *Edenfield*. *See Burkow v. City of Los Angeles*, 119 F. Supp. 2d 1076, 1080-81 (C.D. Cal. 2000).

Second, appellees say that *Edenfield* does not apply to all commercial speech cases but only to those dealing with advertising by professionals. This argument does not explicitly appear in appellees' brief but was mentioned at oral argument and is perhaps best viewed as a variation of their first argument that traffic safety and aesthetics are entitled to greater deference than other interests in analyzing commercial speech cases. While *Edenfield* involves advertising by accountants and has been applied in lawyer advertising cases, *see Fla. Bar,* 515 U.S. 625-26, nothing in *Edenfield* or any other Supreme Court precedent suggests that *Edenfield*'s applicability is limited in the manner suggested by appellees. Moreover, the Court's continued reliance on *Edenfield* and its requirement that the harms articulated by the state in support of a commercial speech not be merely conjectural or speculative belies any claim that *Edenfield* is confined to advertising by professionals. *See, e.g., Lorillard Tobacco*, 533 U.S. at 555 (addressing state regulation of tobacco

---

[7] It bears noting that the dissent has done its own evidentiary research and identified a number of ordinances in other jurisdictions similar to that at issue here. Accepting *arguendo* that the existence of similar statutes would itself be sufficient to meet Glendale's burden, Glendale is the party responsible for accumulating this evidentiary record. A court's role is not to search for evidence that a party *could* have located and submitted but did not. Nor should a court base its decision on an evidentiary record of its own creation. In contrast to the dissent's approach, the *Metromedia* opinion bears no indication that the Court itself did research on legislative action. Rather, it appears that the judicial history of billboard regulation gave the Court information as to the legislative history.

[8] Finally, even assuming *Metromedia* is applicable to this case, *Edenfield*–coming more than a decade later–must be read as a refinement of the *Central Hudson* framework relied upon in *Metromedia*. *Edenfield*, not *Metromedia*, requires the result here.

advertising); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999) (addressing FCC restrictions on advertising of legal gambling); *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995) (addressing restrictions on the advertising of beverage alcohol content).

Third, appellees focus on the notion that less is required of a governmental entity when its interests are aesthetics. Appellees suggest that the invocation of aesthetic objectives carries with it some talismanic quality that, under case precedents, legitimizes all signage regulation and relieves them from making the showing required in *Edenfield*. Appellees direct our attention to *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984). They argue that *Vincent*, when read in conjunction with *Metromedia*, establishes that billboards and signs constitute visual blight and clutter that justify ameliorative regulation. *See Vincent*, 466 U.S. at 808-09 ("It is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm.' The same is true of posted signs.") (quoting *Metromedia*, 453 U.S. at 510). Under appellees' theory, they need not provide evidence that "For Sale" signs create aesthetic harm because the Court has accepted as a matter of course that signs and billboards may be considered a visual blight.

The appellees' view of *Vincent* overlooks several critical points. The Court in *Vincent* was not considering a restriction on commercial speech only and was not applying the *Central Hudson* test. Rather, the restrictions on posting signs in *Vincent* applied to all forms of speech and were truly content-neutral, unlike the ordinance here (which, as we discuss below, is not content-neutral). In this context, the Court recognized the legitimacy of aesthetics as a governmental interest, a point with which we agree and Pagan does not contest. Looking to *Metromedia*, the Court then noted that signs as well as billboards could pose aesthetic harm. This is another point with which we have no disagreement. We differ from appellees, however, in believing that recognition of aesthetics as a substantial governmental interest tells us nothing about how to resolve this case. *Vincent* certainly does not suggest, either explicitly or implicitly, that, in examining restrictions on commercial speech, aesthetic interests are to be treated differently from other governmental interests. Also, *Vincent* gives us no instruction about application of the *Central Hudson* test, and it says nothing about the rule of *Edenfield*, decided some nine years later. In fact, the Court in *Vincent* does not specifically tell us what evidence Los Angeles presented about its interests or the concerns that prompted enactment of the ordinance. *Vincent*, then, to the extent that it is relevant, simply tells us that the Court has recognized that proven aesthetic interests may prompt restrictions on signs, a point that leads nowhere in the resolution of this case.

Appellees' argument about the special nature of aesthetic concerns does not address the more fundamental problem with appellees' aesthetic justification. As we have noted, as an abstract matter, aesthetic issues are appropriate considerations in developing speech regulations. The record before us does not, however, disclose what Glendale's aesthetic objectives are. Perhaps Glendale hopes to avoid unsightly signage cluttering neighborhood streets; perhaps Glendale seeks to avoid having its streets filled with vehicles that may often not be the sort of automobiles people would like to have parked on their neighborhood streets; perhaps "For Sale" signs posted on cars are simply not in keeping with the character of Glendale's neighborhoods. There are various possibilities, but it is not the place of the reviewing court to supply hypothetical justifications for speech regulation. *Cf. Edenfield*, 507 U.S. at 768 (noting that with respect to the second *Central Hudson* prong regarding the existence of substantial government interests, "[u]nlike rational-basis review, the *Central Hudson* standard does not permit us to supplant the precise interests put forward by the State with other suppositions.") (citing *Fox*, 492 U.S. at 480).

Even if appellees' view of *Metromedia* and *Vincent* is closer to the mark than ours and whatever the evidentiary requirement may be to show that a particular medium of communication poses aesthetic harm, a reviewing court must, as a preliminary matter, be apprised of what the government's aesthetic motivations are. Glendale fails to supply even this rudimentary information,

saying in the Fruchey affidavit only that the ordinance addresses unspecified "aesthetic objectives." This general assertion fails to identify Glendale's aesthetic concerns with "For Sale" signs. Certainly, it does not suffice to show concrete harms addressed by the ordinance or that the ordinance directly and materially advances the government interest, as required by the third prong of *Central Hudson*. While the dissent questions any requirement that would mandate a study before limiting speech in furtherance of undoubtedly *subjective* aesthetic aims, our decision imposes no such requirement. Assuming that the subjective nature of aesthetics requires that we give regulators a freer hand when examining restrictions on commercial speech, it seems no great burden to require, as a threshold matter, that they offer something more specific than a bald assertion that the regulation reflects aesthetic considerations.

The dissent critiques our decision as "read[ing] into the First Amendment a requirement that governments go through pointless formalities before they enact . . . commonsense rule[s] . . . ." We have no interest in preventing the adoption of common sense rules or requiring legislative bodies to engage in "pointless formalities." In contrast to those situations in which we apply rational basis review, the intermediate scrutiny we apply in the commercial speech context charges the government with the burden of justifying its chosen form of regulation. Thus, even common sense decisions require some justification. Otherwise, we have no basis for concluding that Glendale's legislative decision is animated by reasoned judgment and not hostility toward particular speech. Moreover, if the need for the regulation is as obvious as Glendale and the dissent believe it to be, it seems that Glendale should be ideally positioned to provide *some* evidence of the need for its regulation–a task that Glendale has been entirely unwilling to undertake.[9] We do not hold Glendale's ordinance invalid because Glendale has failed to produce *sufficient* evidence. Rather, we simply cannot uphold the ordinance without *any* evidence at all to support the need for its enactment and simultaneously follow what we view to be the clear command of the Supreme Court.

One aspect of our decision the dissent appears to find particularly troubling is its belief that it will impose a severe burden on municipalities seeking to regulate signage that they believe raises legitimate and undeniably important traffic safety and aesthetic concerns. While we disagree that the burden is severe and instead believe it fairly easily met, we note that the fact that the First Amendment imposes a requirement of evidentiary justification upon a regulatory authority is not, in and of itself, a cause for dismay.

As previously stated, our decision today does not prescribe the manner by which municipalities must justify these sorts of ordinances. Instead, we simply conclude that we cannot discharge our obligation to scrutinize commercial speech restrictions if we deem sufficient the conjectural affidavit of Glendale's police chief that offers nothing more than a statement of what he believes to be Glendale's regulatory objectives. It is Glendale's obligation to provide *something* in support of its regulation, and we do not find ourselves free to hold that obligation has been discharged based on principles of *common sense* or *obviousness*, especially where, as here, all do not agree as to what is obvious or a matter of common sense. A judicial pronouncement that an ordinance is consistent with common sense hardly establishes that it is so.

---

[9]The dissent particularly notes *Jobe v. City of Catlettsburg*, 409 F.3d 261 (6th Cir. 2005), in which our court analyzed a content-neutral "time, place, and manner restriction." In *Jobe*, we noted that upholding common sense explanations for ordinances like one prohibiting placing leaflets on vehicles does not require proof that the problem has occurred in the past or an "elaborate study of their present-day necessity," referencing particularly the age of the ordinance in question, enacted in 1952. We do not disagree with *Jobe*. But an ordinance's long tenure cannot excuse the need for some justification, even though that justification need not come in the form of an "elaborate study" or a recitation of past problems. Here, our only evidence is speculation about why a local legislative body might have wanted such an ordinance. In *Jobe*, the ordinance drew justification from the town mayor's explanation of its current relevance, its placement in the city code, and the content of the neighboring ordinances.

B.

The district court did not specifically address tailoring, but Pagan argued before the trial court, as he does on appeal, that the regulatory means chosen by Glendale lack a reasonable fit to the regulatory ends. The district court did, however, note that Pagan's claims along these lines were nothing more than conclusory assertions regarding his own notions of a more reasonable regulatory scheme and that it was not the place of the courts to second-guess Glendale's decision regarding appropriate traffic ordinances.

While we need not reach the issue of tailoring because our decision regarding the third *Central Hudson* prong is dispositive in this case, it is important to note that, contrary to the district court's conclusion, the regulatory authority bears the burden of establishing a reasonable fit when regulating commercial speech. In the commercial speech context at least, our review will, to some extent, require examination of the means chosen by the government. The obligation rests with the government to establish that its regulation is "narrowly tailored" and that it has carefully calculated the costs and benefits of regulation. *See Discovery Network*, 507 U.S. at 417-18; *see also Fox*, 492 U.S. at 480.

IV.

Appellees also argue that we need not engage in an analysis under *Central Hudson* because the prohibition on parking a car on the streets of Glendale for the purpose of advertising is a content-neutral time, place, or manner regulation and should be analyzed under that framework. Although their brief does not specify whether this argument refers to subsection (A) or (C), or both, it is most naturally understood as relating to subsection (C), because subsection (A) contains its own implicit reference to content. If appellees were successful in characterizing the ordinance as content-neutral, our inquiry here would still be a form of intermediate scrutiny, focusing on whether the restriction is narrowly tailored to serve substantial government interests and leaves open ample alternative channels of communication. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989).

The Glendale ordinance cannot be evaluated as a content-neutral restriction, however, because, as appellees conceded during oral argument, the restriction on advertising does depend on the content of the speech: namely, the ordinance, as construed by Glendale, draws a distinction between promotional speech and speech asserting belief or fact.[10] The Supreme Court has made clear that any regulation that requires reference to the content of speech to determine its applicability is inherently content-based. *Cf. Discovery Network*, 507 U.S. at 429 ("Under the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside . . . . Thus, by any commonsense understanding of the term, the ban in this case is 'content based.'"). Characterization of the ordinance as a content-neutral time, place, or manner restriction is simply inaccurate.

V.

For the foregoing reasons, we reverse the district court's grant of summary judgment and remand this cause for further proceedings consistent with this opinion.

---

[10]Specifically, appellees stated at argument, in response to questioning, that the ordinance would apply to both speech promoting a commercial transaction and speech promoting a political candidate but would not apply to speech declaring one's child to be an honor student or advocating readiness for the coming of Jesus.

––––––––––––––––––

**DISSENT**

––––––––––––––––––

ROGERS, J., dissenting.   The justification for forbidding the placement of for-sale automobiles on the public streets—for inspection by potential buyers—is simply obvious:  people may be drawn to stand in the street for nontraffic purposes.  The act of selling a car in a public street invites prospective buyers into the road to examine the car, and common sense supports a ban on such acts.  To read into the First Amendment a requirement that governments go through pointless formalities before they enact such a commonsense rule is, in my view, to cheapen the grandeur of the First Amendment.  To require a study, or testimony, or an affidavit, to demonstrate the obvious is to turn law into formalistic legalism.  Nothing in Supreme Court precedent requires such a step.

Indeed, *Metromedia* strongly supports upholding the ordinance without any artificial record evidence requirement.  *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 509 (1981).  In *Metromedia*, the Supreme Court, in a split opinion, invalidated a city's ban on off-site billboard advertising because of the extent to which the ban affected noncommercial speech.  *Id.* at 512-21 (plurality); *id.* at 521-40 (Brennan, J., concurring in the judgment).  Under the reasoning of a strong majority of the Court, however, the city's ban on off-site billboard advertising was determined to be constitutional to the extent that it regulated commercial speech.  *Id.* at 503-12 (plurality) (ban complies with First Amendment to extent it applies to commercial speech); *id.* at 541 (Stevens, J., dissenting in part) (same); *id.* at 555-69 (Burger, C.J., dissenting) (ban altogether constitutional); *id.* at 569-70 (Rehnquist, J., dissenting) (same).  While the reasoning of these various opinions differed, a *majority of five justices* adopted the reasoning of Justice White's plurality opinion with regard to the constitutionality of the billboard ban to the extent it dealt with *commercial speech*.  Since the instant case deals exclusively with commercial speech, the portion of Justice White's opinion for four justices (i.e. Parts I - IV), joined also by Justice Stevens, 453 U.S. at 541 (Stevens, J., dissenting in part), is directly controlling for this court.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 540-41 (1985).

That analysis directly supports upholding the ordinance in this case.  The *Metromedia* Court majority determined that the ban on commercial speech met each element of the *Central Hudson* test: (1) the speech did not involve unlawful activity and was not misleading, and thus was entitled to First Amendment protection; (2) the ban sought to implement a substantial government interest; (3) it directly advanced that interest; and (4) it reached no further than necessary to accomplish the given objective.  453 U.S. at 507-17.  The same result follows in this case.  First, the speech does not involve unlawful activity and is not misleading.  Second, the "substantial government interests" identified in *Metromedia*, traffic safety and appearance of the city, are remarkably close to those identified in this case, and Pagan concedes that the Village's asserted interests are "substantial."

The "more serious question" in *Metromedia*, as in this case, was the third criterion—whether the ordinance directly advanced the identified interests.  The Court majority rejected an argument that the record was insufficient to establish a connection between billboards and traffic safety.  453 U.S. at 509.  Although the record was "meager" on this point, the California Supreme Court, taking into consideration the fact that "[billboards] are intended to, and undoubtedly do, divert a driver's attention from the roadway," had refused to strike down a reasonable legislative judgment regarding how to deal best with such distractions.  *Id.* at 508-09.  The United States Supreme Court majority likewise held that San Diego could constitutionally ban commercial speech billboards, hesitating "to disagree with the accumulated, *commonsense judgments of local lawmakers* and of the many reviewing courts that billboards are real and substantial hazards to traffic safety."   *Id.* at 509 (emphasis added). The majority concluded:

There is nothing here to suggest that these judgments are unreasonable. As we said in a different context:

> We would be trespassing on one of the most intensely local and specialized of all municipal problems if we held that this regulation had no relation to the traffic problem of New York City. It is the judgment of the local authorities that it does have such a relation. And nothing has been advanced which shows that to be palpably false.

*Id.*

A closely parallel analysis is dispositive here. The commonsense judgment of Glendale's lawmakers is, if anything, far more compelling in this case. Simply put, exhibiting cars for sale on the public roadway may interfere with the dedication of such roadways to traffic and its necessary incidents. The ban on placing cars in the roadway for sale undoubtedly directly advances the Village's interest in traffic safety.

Noteworthy in the *Metromedia* Court majority's analysis is the total absence of reliance on record evidence to support its direct advancement rationale. This despite the *Metromedia* plaintiffs' assertion that the record was inadequate to support the ban on off-site billboard advertising and the Court majority's recognition that the California Supreme Court had noted the meagerness of the record. Common sense prevailed in that case, and common sense even more strongly supports the conclusion that substantial interests are directly advanced in this case. Indeed, the Supreme Court recognized in *Florida Bar v. Went for It, Inc.*, 515 U.S. 618, 628 (1995), that even in a First Amendment case applying strict scrutiny, restrictions may be justified "based solely on history, consensus, and 'simple common sense.'" (citing *Burson v. Freeman*, 504 U.S. 191, 211 (1992)). *See also United States v. Edge Broadcasting Co.*, 509 U.S. 418, 428 (1993) (upholding a ban on radio advertisements of lotteries in states where lotteries were illegal and, addressing *Central Hudson*'s third prong, stating that "Congress plainly made the commonsense judgment that each North Carolina station would have an audience in that State . . . and that enforcing the statutory restriction would insulate each station's listeners . . . and hence advance the governmental purpose of supporting North Carolina's laws against gambling"). Indeed, this court stated in *Jobe v. City of Catlettsburg*, 409 F.3d 261, 269 (6th Cir. 2005), a case upholding against a First Amendment challenge an ordinance against placing leaflets on vehicles, that "[i]n view of the common-sense explanations for these types of laws, they do not invariably require proof that the problem has occurred in the past (a daunting task in view of the 1952 vintage of this law and the understandable absence of information about why the law was passed) or an elaborate study of their present-day necessity (an equally daunting task in view of the difficulty of showing the empirical necessity for a law that has been in place for more than 50 years)." Although the ordinance at issue in *Jobe* was analyzed as a content-neutral "time, place, and manner" restriction, the analysis is substantially similar, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554 (2001), and the same considerations the court highlighted in *Jobe* are applicable here. *Metromedia* thus compels the conclusion that the ban on selling cars in the street "directly advances" the traffic safety interest in this case.

The majority in *Metromedia* relied in part on the large number of similar local laws throughout the country that had previously been upheld when subjected to constitutional attack. *Metromedia*, 453 U.S. at 509 n.14. Similarly in this case, Glendale is hardly alone in banning the placement of cars for sale in the public streets. Just within the four states comprising the Sixth Circuit alone there are more than 200 similar ordinances. *See* Appendix; *see, e.g.*, Flint, Mich., Code of Ordinances § 28-9 (1950); Michigan Uniform Traffic Code for Cities, Townships, and Villages R 28.1814, Rule 814 (2003); Louisville–Jefferson County, Ky., Code of Ordinances § 72.044 (1960); Toledo, Ohio, Municipal Code § 351.07 (1997); The Ohio Basic Code § 76.07

(2002); Memphis, Tenn., Code of Ordinances § 11-40-4 (1985). The large number of municipalities with similar ordinances "suggests that the policy behind them is premised on legitimate rather than contrived police-power concerns." *Jobe*, 409 F.3d at 269.

To be sure, the Supreme Court held in *Edenfield v. Fane*, 507 U.S. 173 (1999), that a state may not constitutionally ban CPAs from direct contact with potential clients without demonstrating that harms may flow from such contact. Therefore, it is argued, a city may not ban the exhibiting of automobiles for sale on the public streets without first demonstrating the unprotected harms that may flow from such conduct. With respect, such a legal inference falls of its own weight. The ban's effect on the harm addressed in the CPA case was not clearly established; in the present case it is compellingly obvious. The cases are flatly different on their face.

Nothing in our ironclad obligation to follow the holdings of the Supreme Court requires us to read *Edenfield* beyond the facts of the case to a set of facts that is meaningfully different. In *Edenfield*, the Court held that a single affidavit was insufficient to support a law banning in-person solicitation by CPAs. 527 U.S. at 771-72. Although the Court determined in *Edenfield* that an affidavit was not sufficient, the Court also had before it a report contradicting the Florida Board of Accountancy's assertions regarding the supposed effects of CPA solicitation. *Id.* at 772. It simply does not follow from *Edenfield* that Glendale is not free, without evidence or studies, to make a commonsense determination that allowing business to be conducted in the street presents certain hazards. *Edenfield* did not declare that, henceforth, any regulation of commercial speech must be accompanied by studies regarding the harm to be prevented, no matter how obvious that harm may be. Nor did *Edenfield* mark the death of common sense as a useful tool in the lawmaker's toolbox. *Edenfield* cannot be read to require a study or evidence of nonspeech harm any time a city wishes to remove from its roads distractions that are, by their nature, meant to draw pedestrians into the roadway.

Other cases are even less applicable.

In *Florida Bar v. Went for It*, 515 U.S. 618 (1995), the Supreme Court *upheld* a commercial speech ban prohibiting lawyers from sending direct-mail solicitations to victims of recent accidents or disasters, on the ground that the requirements of *Edenfield* were met given the existence of record evidence supporting the ban. *Id.* at 626-28. The Court's reliance on the record evidence in *Florida Bar*, however, should not lead this court to mistake sufficiency for necessity, especially given that the Court also emphasized that previous litigants were successful in justifying speech restrictions "by reference to studies and anecdotes pertaining to different locales altogether . . . or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense." *Id.* at 628 (internal citations and quotation marks omitted). The judgment of the Supreme Court in *Florida Bar* is simply not a holding regarding what is required to meet the third prong of *Central Hudson*, but is rather a holding as to what is sufficient, and thus adds nothing to the requirements of *Edenfield*.

The Supreme Court in *Thompson v. Western States Medical Center*, 535 U.S. 357 (2002), explicitly refrained from holding that the statutory provision at issue failed the third requirement of *Central Hudson*. The statutory provision at issue essentially provided that "as long as pharmacists do not advertise particular compounded drugs, they may sell compounded drugs without first undergoing safety and efficacy testing and obtaining FDA approval." 535 U.S. at 370. Regarding whether the advertising ban directly advanced the Government's asserted interests related to non-FDA approved compounded drugs, the Court reasoned that, "[a]ssuming it is true that drugs cannot be marketed on a large scale without advertising, the [statutory] prohibition on advertising compounded drugs *might indeed* 'directly advanc[e]' the Government's interests." *Id.* at 371 (emphasis added). The Court proceeded to the final *Central Hudson* prong on the assumption that the third prong was met. *Id.* (Under that final prong, the fact that the restrictions were more

extensive than necessary invalidated the provision: the Court identified numerous ways in which large-scale manufacturing of compounded drugs might be identified without using the proxy of commercial speech. *Id.* at 372.)

In *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556-61 (2001), the Supreme Court held that a ban on advertising for smokeless tobacco or cigars within 1000 feet of a school *did* directly advance a substantial governmental interest under *Central Hudson*'s third step. As in *Florida Bar*, the government was able to point to record evidence in the form of studies to support its contention that the ban on commercial speech directly advanced its asserted interests. Again, however, the presence of studies in *Lorillard* merely establishes that such studies are sufficient, not that they are necessary, to pass muster under *Central Hudson*'s third prong. (As in *Thompson*, only lack of a "reasonable fit," the fourth *Central Hudson* inquiry, rendered the provision unconstitutional: the 1000-foot rule would constitute nearly a complete ban on the communication of truthful information about smokeless tobacco and cigars to adult consumers in some geographical areas. *Id.* at 562.)

In all of these cases, the only holding that the third step of *Central Hudson* was not met, in addition to *Edenfield*, was one aspect of the tobacco sales practices regulated in *Lorillard*: certain tobacco advertising could not be placed lower than five feet from the floor of any retail establishment within 1000 feet of a school. This failed the *Central Hudson* third step, not for lack of empirical evidence but because the five-foot rule "does not seem to advance th[e] goal" of preventing minors from using tobacco products. *Lorillard*, 533 U.S. at 566. Children under five feet tall, the Court noted, can look up. In contrast, banning the placement of autos in the public streets for sales inspection more than "seems" to advance the goal of traffic safety, it obviously does so.

In short, the Court's holdings, and *Edenfield* in particular, do not require the conclusion that without record evidence, a regulation that so obviously advances a substantial interest is invalid. It is true that, as the Court majority stated in *Metromedia*, "[e]ach method of communicating ideas is 'a law unto itself' and that law must reflect the 'differing natures, values, abuses and dangers' of each method." 453 U.S. at 502 (quoting *Kovacs v. Cooper*, 336 U.S. 77, 97 (1949)). We cannot however simply dismiss the Supreme Court's decision in *Metromedia* because the Court pointed out that it was dealing only with billboards. Indeed, the "natures, values, abuses and dangers" of selling cars in the streets are far closer to those of setting up billboards than they are to the direct solicitation of clients by CPAs. The "abuses and dangers" of billboard advertising are indeed very similar to the abuses and dangers of selling cars in the streets: traffic safety concerns and visual aesthetics. The abuses and dangers of direct solicitation by CPAs are entirely distinct: avoiding fraud and maintaining CPA ethics. Thus any argument that a particular Supreme Court holding does not apply because of the differences in methods of communicating ideas would require us to disregard *Edenfield* long before it would require us to disregard *Metromedia*. We should disregard neither, but apply each to the extent its reasoning controls on facts meaningfully similar to those in this case.

Of course if the two cases conflict, then *Edenfield* would control on the theory that the Supreme Court has to that extent overruled *Metromedia*. We should not rush to that conclusion, however, where there is a meaningful distinction between the two cases. With respect to the third prong of *Central Hudson*, the distinction between the ordinance in *Metromedia* and the statute in *Edenfield* is stark: there is obvious "direct advancement" in *Metromedia* and nothing of the sort in *Edenfield*. Accordingly, while the First Amendment requires record evidence in *Edenfield*, it does not in *Metromedia*. The distinction cuts squarely in favor of Glendale in this case. It is not up to us to overrule *Metromedia*, and *Edenfield* did not do so, either explicitly or *sub silentio*.

Finally, Glendale's ordinance also clearly passes *Central Hudson*'s fourth prong. The ordinance is not more extensive than necessary to serve Glendale's asserted interests in traffic safety. "The least restrictive means test has no role in the commercial speech context." *Florida Bar*,

515 U.S. at 632 (internal quotation marks omitted).  Glendale need only demonstrate that there is a fit between its ordinance and the ends it seeks to achieve.  *Id.*

The ordinance exactly serves Glendale's purposes.  Although it is true that cars parked in a private driveway fronting a public street may also prove distracting, it is not true that such activity invites people into the roadway for purposes of inspecting the car that has been advertised for sale. Glendale has properly limited the reach of the ordinance to public property; Glendale could reasonably conclude that the dangers attendant to placing a car for sale in a public street outweigh any harm that may occur when a property owner decides to place an automobile for sale on his own property. *Cf. Metromedia*, 453 U.S. at 490 ("[T]he city may believe that offsite advertising . . . presents a more acute problem than does onsite advertising.").  Indeed, given Glendale's interests in ensuring that individuals remain out of the roadway, it makes eminent sense to limit the reach of the ordinance to cars parked on public streets.  While it is true that "numerous and obvious less-burdensome alternatives to the restriction on commercial speech . . . is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable," *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993), the only apparent alternative for Glendale is to outlaw pedestrians' presence in a roadway to inspect a vehicle.  Of course, this does nothing to eliminate the very enticement that may lead prospective buyers into the roadway in the first place and does nothing to prevent driver distraction.

Because Glendale has crafted an ordinance that goes no further than necessary to address a substantial public concern, the judgment of the district court should be affirmed.

It is accordingly not necessary to rely in addition on Glendale's asserted aesthetic interests, and I treat them only briefly here.  Those interests appear independently sufficient to support the restriction on commercial speech in this case.  A majority of seven Justices in *Metromedia* concluded that San Diego's aesthetic interests were sufficient to support San Diego's ordinance to the extent that it regulated commercial speech. *Metromedia*, 453 U.S. at 510 (plurality); *id.* at 552 (Stevens, J., dissenting in part); *id.* at 559-61 (Burger, C.J., dissenting); *id.* at 570 (Rehnquist, J., dissenting). As with respect to San Diego's regulation of commercial billboards, Glendale should not be required to come forward with studies to support its conclusion that city aesthetics would be improved by avoiding the transformation of public streets into used car lots or open-air markets. In a less obvious case, the Supreme Court, relying on *Metromedia*'s treatment of an aesthetics interest, upheld a Los Angeles ban on posting signs on public property such as utility poles. *Members of the City Coun. of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 805-807 (1984). "It is well settled that the state may legitimately exercise its police powers to advance esthetic values." *Id.* at 805. Without reliance on  empirical evidence in the record, the Court reasoned that

> The problem addressed by this ordinance—the visual assault on the citizens of Los Angeles presented by an accumulation of signs posted on public property—constitutes a significant substantive evil within the City's power to prohibit. "[The] city's interest in attempting to preserve [or improve] the quality of urban life is one that must be accorded high respect."

*Id.* at 808 (citations omitted).  A similar conclusion without record evidence is warranted here with respect to cars placed for sale on city streets.  Indeed, insisting on a study regarding aesthetics would be particularly pointless given the essentially subjective nature of the topic.  The *Vincent* Court also held that the Los Angeles posting ban was not unconstitutionally broad:

> By banning these signs, the City did no more than eliminate the exact source of the evil it sought to remedy.  The plurality wrote in *Metromedia*: "It is not speculative to recognize that billboards by their very nature, wherever located and however

> constructed, can be perceived as an 'esthetic harm.'" 453 U.S., at 510. The same is true of posted signs.

*Id.* at 808.  The same can be said of cars placed for sale on city streets.

Finally, I do not address the constitutionality of subsection (C) of the Glendale ordinance. Pagan initially challenged this portion of the ordinance, which prohibits placing vehicles in the road for the purposes of any advertising, as a violation of the Equal Protection and Due Process Clauses of the United States Constitution.  However, Pagan withdrew this claim for relief in his motion for summary judgment in the district court, choosing to argue instead that Glendale's failure to regulate other kinds of signs or to fully enforce the ordinance's ban on advertising undermined Glendale's asserted interest in traffic safety with respect to subsection (A).  Thus, Pagan expressly limited any consideration of subsection (C) to whether a failure to enforce that subsection undermined Glendale's arguments about the constitutionality of subsection (A).  Given that Pagan himself failed to argue the constitutionality of subsection (C) below, the issue was waived and I have no occasion to address whether subsection (C) violates the First Amendment, *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1172 (6th Cir. 1996), or whether, in the absence of any allegation that Pagan intends to engage in activity that violates subsection (C) without violating (A), he would have standing to assert a First Amendment challenge to subsection (C), *see Prime Media, Inc. v. City of Brentwood*, 474 F.3d 332, 340 (6th Cir. 2007).

I respectfully dissent.

**APPENDIX**

**Ordinances Forbidding the Placement of Cars for Sale in the Public Streets**

Kentucky

Alexandria, Code of Ordinances § 72.11 (1988)

Ashland, Code of Ordinances § 72.004 (1983)

Augusta, Code of Ordinances § 72.11

Berea, Code of Ordinances § 40.304 (1946)

Bowling Green, Code of Ordinances § 22-4.09 (2001)

Cadiz, Code of Ordinances § 72.11

Cold Spring, Code of Ordinances § 71.04 (1997)

Covington, Code of Ordinances § 75.08 (1967)

Crescent Springs, Code of Ordinances § 72.11

Crestview Hills, Code of Ordinances § 72.11

Danville, Code of Ordinances § 17-35 (1977)

Edgewood, Code of Ordinances § 72.11

Flemingsburg, Code of Ordinances § 72.11

Fort Mitchell, Code of Ordinances § 72.11 (1988)

Fort Thomas, Code of Ordinances § 72.15 (1983)

Fort Wright, Code of Ordinances § 72.11

Hillview, Code of Ordinances § 72.11 (1984)

Louisville–Jefferson County, Code of Ordinances § 72.044 (1960)

Madisonville, Code of Ordinances § 72.11

Pikeville, Code of Ordinances § 72.010

Walton, Code of Ordinances § 72.11

Warsaw, Code of Ordinances § 72.11

Michigan

Bingham Farms, Code of Ordinances § 95.10 (2005)

Burton, Code of Ordinances § 71.02

Clinton Township, Code of Ordinances §§ 886.10; 886.11 (1986)

Eastpointe, Code of Ordinances § 480.05 (1988)

Flint, § 28-9 (1950)

Howell, § 430.05

Marshall, § 73.18 (1992)

Mason, § 8.14

Saginaw, Code of Ordinances § 72.22 (1959)

Uniform Traffic Code for Cities, Townships, and Villages, R 28.1814 Rule 814 (2003)

Ohio

Ada, § 351.06

Amherst, § 351.07 (1980)

Avon, § 452.08

Avon Lake, § 452.08

Bay Village, § 351.06

Bedford, § 351.06

Bedford Heights, § 351.06 (1970)

Bellbrook, § 452.08

Bellvue, § 351.06 (2002)

Belpre, § 351.06

Berea, § 751.05 (1988)

Blue Ash, § 351.06

Bowling Green, § 76.09(1965)

Bratenahl, § 351.06 (1960)

Broadview Heights, § 452.08 (1976)

Brook Park, § 351.06

Brunswick, § 452.06

Bryan, § 351.06

Canal Winchester, § 351.06

Carey, § 351.06

Carlisle, § 452.08

Chagrin Falls, § 351.06

Cheviot, § 76.18 (1998)

Circleville, § 351.06

Cleveland Heights, § 351.06

Clyde, § 351.06

Conneaut, § 351.06

Cortland, § 351.06

Cuyahoga Heights, § 452.09

Defiance, § 351.06

Delaware, § 351.06 (1967)

Delphos, § 351.06

Dover, § 351.06 (1966)

Dublin, § 76.04 (1980)

East Palestine, § 452.12 (1956)

Elyria, § 351.06 (1945)

Englewood, § 452.08

Euclid, § 351.08

Evendale, § 452.08 (1952)

Fairfield, § 351.06

Findlay, § 351.06

Forest Park, § 73.12 (1961)

Franklin, § 351.06

Fremont, § 351.06

Gahanna, § 351.06

Gates Mills, § 352.08

Geneva, § 452.08

Glenwillow, § 351.06

Green, § 452.08

Greenhills, § 351.06

Greenville, § 452.08 (1960)

Greenwich, § 452.08

Grove City, § 351.06

Groveport, § 351.06

Hamilton, § 351.06

Harrison, § 351.06

Hicksville, § 351.09

Highland Heights, § 351.06

Highland Hills, § 351.06

Hilliard, § 351.06

Hunting Valley, § 351.01

Independence, § 351.09 (1958)

Johnstown, § 351.06

Lakewood, § 351.16 (2001)

Lancaster, § 351.06

Lebanon, § 351.06

Lexington, § 351.06

London, § 452.09 (1998)

Lorain, § 351.06

Lordstown, § 351.06

Louisville, § 351.06

Loveland, § 351.06

Lyndhurst, § 452.08

Macedonia, § 351.06

Mansfield, § 351.06

Maple Heights, § 452.08 (1967)

Marble Cliff, § 351.06

Marietta, § 351.06

Massillon, § 351.06

Mayfield Heights, § 351.08

Mayfield Village, § 351.06

Mason, § 351.06

Maumee, § 351.06

Medina, § 351.06

Mentor-on-the-Lake, § 452.08

Middlefield, § 351.06

Milan, § 351.06

Monroeville, § 351.06 (1978)

Montpelier, § 351.06

Mount Gilead, § 351.06

Mount Vernon, § 351.06 (1988)

Munroe Falls, § 351.06

New Albany, § 351.06

New Lebanon, § 73.06 (1980)

Niles, § 351.06

North Canton, § 351.06

North Perry, § 351.06

North Ridgeville, § 452.08

North Royalton, § 452.08

Norton, § 452.09 (1968)

Norwalk, § 351.06

Oberlin, § 351.06 (1957)

Ontario, § 351.06

Orange, § 351.06

Orville, § 351.06

Ottawa, § 351.06

Painesville, § 351.06

Parma, § 351.06 (1997)

Perrysburg, § 452.08 (1964)

Powell, § 351.06

Reading, § 452.08) (1982)

Reminderville, § 351.06 (1990)

Reynoldsburg, § 351.06

Richmond Heights, § 351.06

Riverlea, § 76.07

Rossford, § 351.06 (1966)

St. Bernard, § 351.15

St. Mary's, § 351.06

Sandusky, § 351.06

Shelby, § 452.09

Sidney, § 351.09

Silverton, § 76.16 (1954)

Solon, § 452.08

South Euclid, § 351.06

Springboro, § 452.08

Streetsboro, § 351.06

Strongsville, § 452.08 (2000)

Stow, § 351.06

Summit County, § 351.06

Tallmadge, § 351.06

Tiffin, § 351.06

Tipp City, § 76.07 (1974)

Toledo, § 351.07 (1997)

Troy, § 351.06

Twinsburg, § 351.06 (1958)

University Heights, § 452.09

Upper Sandusky, § 351.06

Valley View, § 452.09 (1965)

Vandalia, § 452.09

Van Wert, § 76.07 (1981)

Vermilion, § 452.08

Walton Hills, § 452.09 (1969)

Wapakoneta, § 452.08

Warren, § 351.06

Warrensville Heights, § 351.12

Waynesville, § 76.08 (1982)

Wellington, § 351.06

Westerville, § 351.06

Westfield Center, § 452.09

Wickliffe, § 351.06

Willoughby, § 452.09 (1971)

Willowick, § 351.06

Wilmington, § 351.06

Woodmere, § 351.06

Woodville, § 351.06

Wooster, § 351.06

Worthington, § 351.06

Youngstown, § 351.06

The Ohio Basic Code, § 76.07 (2002)

Tennessee

        Alcoa, § 15-220(6) (1971)

        Arlington, § 15-404 (1997)

        Belle Meade, § 15-601 (1987)

        Bolivar, § 15-1504 (1976)

        Brentwood, § 66-293

        Bristol, § 70-203 (2006)

        Chattanooga, § 24-293 (1986)

        Cleveland, § 15-610 (1981)

        Clinton, § 15-601(3)(h) (1969)

        Farragut, § 15-110

        Germantown, § 20-212 (1986)

        Johnson City, § 15-1108 (1985)

        Knox County, § 62-189 (1991)

        Knoxville, § 17-291 (1962)

        McMinnville, § 15-505 (1982)

        Memphis, § 11-40-4 (1967)

        Morristown, § 15-809 (1979)

        Nashville, § 12.40.150

        Oak Ridge, § 15-609 (1969)

        Red Bank, § 15-601 (1975)

        Sevierville, § 15-603 (1987)

        Shelby County, § 20-86 (1992)

        Signal Mountain, § 15-706 (1985)

        Sparta, § 15-605 (1997)

        Winchester, § 15-820 (1983)