**BENCH BILLBOARD COMPANY,**
**Plaintiff**

v.

**CITY OF TOLEDO, Defendant.**

**Case No. 3:07CV2027.**

United States District Court,
N.D. Ohio,
Western Division.

March 3, 2010.

652

William H. Heywood, III, Shumaker, Loop & Kendrick, Toledo, OH, Eric C. Holzapfel, Drew & Ward, Cincinnati, OH, for Plaintiff, Bench Billboard Company.

John T. Madigan, Keith J. Winterhalter, Mark S. Schmollinger, Department of Law, One Government Center, Toledo, OH, for Defendant, City of Toledo.

## ORDER

JAMES G. CARR, Chief Judge.

This is a case about the regulation of courtesy bus stop benches. Plaintiff Bench Billboard Company alleges under 42 U.S.C. § 1983 that defendant City of Toledo's ordinance governing courtesy benches violates its right to freedom of speech, equal protection and due process. Plaintiff also asserts a cause of action under Ohio common law for tortious interference with prospective economic advantage. Plaintiff seeks declaratory, injunctive and monetary relief.

Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367.

Pending are cross-motions for summary judgment [Docs. 21, 32]. For the reasons discussed below, both motions shall be granted in part and denied in part.

### Background

Plaintiff provides advertising benches at bus stops in Toledo. Its benches are approximately six feet long, two feet wide, and forty-two inches tall. The side of the bench containing the advertisement forms the back rest for the bench and is about two feet high by six feet long.

Plaintiff obtained permits and legally maintained close to 300 advertising benches on city property for many years prior to the city's enacting the current ordinance.

Under the ordinance, person desiring to place benches in the city must apply for, and receive a permit under Toledo Municipal Code, Chapter 719.

In enacting the current chapter 719 in February, 2007, the city noted that "Courtesy Benches are a form of advertising for the bus bench companies, which also provide a needed service for the City of Tole-

do." [Doc. 32–1]. The city's reason for adopting the new ordinance was that "[t]he current ordinance specifies the permitting and placement of these structures along with some general guideline but has no language regarding the maintenance, sanitation, and conditions of the permit. It is necessary to add specific provisions to the code in order to better enforce this chapter of the code." *Id.*

Toledo Municipal Code §§ 719.01 through 719.11 govern placement of courtesy benches in the city. Thomas Kroma, City of Toledo Assistant Chief of Staff, acknowledged that there are no other city guidelines or standards governing the placement of benches.

Under the ordinance:

Courtesy benches for the convenience of local bus patrons and members of the general public, which benches contain advertising matter, may be installed and maintained upon public thoroughfares and public sidewalks of the City by persons, firms or corporations in the manner and subject to the conditions and regulations prescribed by the following sections of this chapter.

TMC § 719.01.

A courtesy bench may not be installed without a permit from the Commissioner of Building Inspection and Code Enforcement [Commissioner], "on forms prescribed by such official." § 719.02(a). The total number of permits which may be issued "shall be at the discretion of the Commissioner" and "[n]o more than one courtesy bench shall be permitted at any bus stop except" when the Commissioner determines that "conditions warrant." TMC § 719.02(b)-(c).

The provision governing permit issuance states:

If the Commissioner ... finds that the applicant has complied with all of the

provisions of this chapter and the maintenance of a bench or benches at the proposed locations will not tend to obstruct passage or create a hazard to persons traveling on the public way in the vicinity thereof, he/she shall issue a permit; otherwise such application shall be denied.

TMC § 719.05.

Section 719.08 provides the requirements for courtesy benches, including, *inter alia:*

(a) No bench shall carry any political advertising ... nor shall any advertisement or sign on any such bench display the words "STOP," "LOOK," "DRIVE–IN," "DANGER," or any other word or words which might mislead or distract traffic.

. . .

(c).... Benches shall be kept at all times in a neat, clean and usable condition and ice, snow, litter and debris shall be removed from the benches and the vicinity thereof in such a manner that each bench shall be accessible at all times

. . . .

(e) All bus benches at all locations shall maintain a trash receptacle affixed to the courtesy bench. The receptacle shall be capable of allowing water and other liquids to pass through.... The permittee is responsible to see that the trash receptacle is emptied on an as needed basis and that the area ten feet in diameter around the bus bench is maintained free of litter and debris.

Chris Zervos, acting Commissioner of Building Inspection testified the specific words prohibited were likely to distract or mislead traffic.

The ordinance permits the Commissioner to revoke a permit for several reasons, including: "When continued maintenance

of a bench at a specified location shall be deemed by the Commissioner ... to be a hazard to pedestrian and vehicular traffic or prejudicial to the interest of the general public." TMC § 719.06(d).

Violation of the ordinance is a minor misdemeanor for the first offense and a fourth-degree misdemeanor for any second offense within a twelve-month period. TMC § 719.99.

The Toledo Area Regional Transit Authority (TARTA) also maintains benches and bus shelters at bus stops around Toledo. According to city officials, these benches are not governed by Chapter 719.

Kroma states that prior to February, 2007, the city received "numerous complaints" regarding litter around benches. [Doc. 21, Ex. 1]. He states that this is the reason for Chapter 719. He additionally states that "safety concerns require that ice and snow be removed form the courtesy benches and their immediate area to make the benches accessible to the public." *Id.* Kroma also testified that litter is a problem generally in the city. Zervos testified that the city received complaints regarding litter around benches. Dennis Johnson, a city building/sign inspector said he was aware of approximately a dozen complaints about courtesy benches, only a few of them relating to litter.

Shortly after the enactment of the new ordinance, plaintiff's permits expired. The city rejected plaintiff's renewal request. The city stated that the benches were not in compliance, in part because trash cans were not affixed, as required by § 719.08(e). The city filed criminal complaints against plaintiff for non-compliance with the ordinance. Plaintiff asserts that the burdens imposed will likely result in removal of its benches.

The city issued courtesy bench permits to Affordable Bench Advertising [Affordable Bench] even though Affordable Bench was not in compliance with the ordinance. Johnson and Zervos testified that Affordable Bench represented that it was actively working to bring the benches into compliance. Criminal complaints were not filed against Affordable Bench even though some of its benches did not comply.

Johnson states that he has not issued any permits since 2008 and that he has ceased citing bench owners for failure to comply with the ordinance since the beginning of this lawsuit.

## Discussion

### I. First Amendment

The First Amendment to the Constitution, applicable to state and local governments through the Fourteenth Amendment mandates that no law shall "abridg[e] the freedom of speech." U.S. Const. amend. I.

A regulation may implicate the First Amendment even if the regulation does not directly prohibit or limit speech. *See Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 502, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) ("Because regulation of a non-communicative aspect of a medium often impinges in some degree on the communicative aspects, it has been necessary for the courts to reconcile the government's regulatory interest with the individual's right of expression."); *Laird v. Tatum,* 408 U.S. 1, 11, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) ("[C]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights.").

Plaintiff raises three separate First Amendment challenges to the city's ordinance: 1) a claim that it operates as a prior restraint because it vests unbridled discretion with the city; 2) a facial challenge to the ordinance's prohibition on po-

litical advertising and the use of certain words; and 3) a facial challenge to the ordinance's requirement that the bench owner affix a trash can to the bench and keep the surrounding area free of litter, snow and ice.

### A. Bench Billboard's Speech is Protected

As a preliminary matter, I note that the First Amendment is implicated here because, as the Sixth Circuit has recognized: "Billboards and other visual signs, it is clear, represent a medium of expression that the Free Speech Clause has long protected." *Prime Media, Inc. v. City of Brentwood*, 398 F.3d 814, 818 (6th Cir. 2005) [*Prime Media I.*] Billboards, however, "pose distinctive problems" because they "take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation." *City of Ladue v. Gilleo*, 512 U.S. 43, 48, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994).

### B. Unbridled Discretion

Plaintiff's first and second causes of action allege that the ordinance violates the First Amendment because it gives unbridled discretion to the Commissioner of Building Inspection and Code Enforcement to determine when to issue courtesy bench permits. Plaintiff brings a facial challenge to the ordinance, asserting that this delegation of discretion amounts to an unconstitutional prior restraint on its free speech rights. The city asserts that the ordinance is sufficiently clear.

#### 1. Standing

■ I first note that plaintiff has standing to bring a facial challenge to the ordinance. As the Sixth Circuit explained in *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 351 (6th Cir.2007) [*Prime Media II* ] (citations and internal quotation marks omitted):

when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subjected to the law may challenge it facially without the necessity of applying for, and being denied, a license. Such a licensing requirement constitutes a prior restraint and may result in censorship. Thus, the prior restraint of a licensing provision coupled with unbridled discretion itself amounts to an actual injury.

A plaintiff is similarly permitted to facially challenge a law on vagueness grounds when the law implicates a plaintiff's first amendment rights even if the law has not been applied to plaintiff in a way that deprives him of those rights. *See Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 59 n. 17, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); *see also Belle Maer Harbor v. Charter Tp. of Harrison*, 170 F.3d 553, 557 (6th Cir.1999).

Plaintiff therefore has standing to challenge the ordinance regardless of whether it has applied for and been denied a license based on a particular reason in the ordinance.

#### 2. Prior Restraint

When a licensing statute "place[s] unbridled discretion in the hands of a government official or agency" over whether to permit or deny expressive activity, "such a statute constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). The court in *Lakewood* stated that to prevent this risk of censorship, cities must "establish neutral criteria to insure that the licensing decision is not based on the content or viewpoint of the speech being considered." *Id.* at 785, 108 S.Ct. 2138. As the Sixth Circuit explained: "At stake is the risk that in the absence of 'narrowly drawn, reasonable and definite

standards for the officials to follow,' the law invites opportunities for the unconstitutional suppression of speech." *Polaris Amphitheater Concerts, Inc. v. City of Westerville,* 267 F.3d 503, 509 (6th Cir. 2001) (quoting *Niemotko v. Maryland,* 340 U.S. 268, 271, 71 S.Ct. 325, 95 L.Ed. 267 (1951)).

Ordinances, thus, that leave complete discretion to a government official over whether to grant or deny a permit for First Amendment protected expression, have been held unconstitutional prior restraints. *Lakewood, supra,* 486 U.S. at 769–770, 108 S.Ct. 2138 (invalidating as prior restraint law giving mayor authority to grant or deny permit for newsrack based on statement that permit was "not in the public interest," and allowed mayor to add "such other terms and conditions deemed necessary and reasonable"); *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (invalidating as prior restraint ordinance that permitted city commission to prohibit parades and demonstrations based on "public welfare, peace, safety, health, decency, good order, morals or convenience").

That an ordinance leaves some discretion with government officials is not, however, necessarily fatal. *Ward v. Rock Against Racism,* 491 U.S. 781, 794, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.").

The Sixth Circuit in *Parks v. Finan,* 385 F.3d 694, 699 (6th Cir.2004), noted: "There is no statute or regulation imaginable that does not require some degree of interpretation by the agency charged with its enforcement." [1]

The court in *Parks* explained that statutory standards requiring a board to determine whether to issue a permit for public gatherings on state capitol grounds based on whether the proposed expression was: "appropriate to the physical context of the capitol," "[a] hazard to the safety of the public," or might "expose the state to the likelihood of unrecoverable expenses" were not so vague as to "engender content-based favoritism." *Id.; see also G.K. Ltd. Travel v. City of Lake Oswego,* 436 F.3d 1064, 1083–84 (9th Cir.2006) (holding that sign permit ordinance allowing city to consider whether or not a sign is "compatible with the surrounding environment" did not leave city officials with an impermissible level of discretion"). *U.S. v. Kistner,* 68 F.3d 218, 221 (8th Cir.1995) (holding that park permit regulation requiring consideration of overcrowding, "peace and tranquility," public health and safety and potential for damage to park facilities was not a grant of unbridled discretion).

Plaintiff alleges that three sections of the ordinance give the Commissioner unbridled discretion: § 719.02, § 719.05, and § 719.06. The city points to the words "shall issue" in § 719.05 to argue there is no unbridled discretion. The city argues that, while the Commissioner may have discretion as to the *total number* of permits to issue, it has no discretion with regard to any single permit.

### a. Permit Issuance

The city is correct that the operative language in the provision governing permit issuance is mandatory: "If the Commissioner ... finds that the applicant has complied with all the provisions of this

---

1. The court in *Parks, supra,* 385 F.3d at 701, went on to hold that the ordinance, as applied to individuals "who may be speaking, wearing signs, and/or leafletting" was unconstitutionally overbroad as it applied to any expressive activity and effectively banned a significant amount of spontaneous speech.

chapter ... he/she *shall* issue a permit." § 719.05 (emphasis added). The "provisions of [the] chapter" include the requirements for an application: "name and address of the applicant, the location of the proposed courtesy bench," § 719.03; a $20 application fee, § 719.04; and a finding that the proposed bench "will not tend to obstruct passage or create a hazard to persons traveling on the public way in the vicinity thereof," § 719.05.

■ I also agree with the city that the language allowing the Commissioner to make a finding that the proposed bench "will not tend to obstruct passage or create a hazard to persons traveling on the public way in the vicinity thereof," § 719.05, is sufficiently specific and does not give the Commissioner too much discretion over when to issue a permit. This language is no less specific than the "hazard to the safety of the public" language noted to be constitutional in *Parks, supra*, 385 F.3d at 699, and "compatible with the surrounding environment" provision upheld in *G.K. Limited Travel, supra*, 436 F.3d at 1083. The ordinance here is, additionally, less worrisome constitutionally because the requirements of the ordinance here are not connected to the content of the expression.[2]

Next, plaintiff objects to § 719.02(b), which leaves the total number of permits issued for courtesy benches to the Commissioner's discretion and § 719.02(c), which allows the Commissioner to permit more than one bench at a single bus stop "when conditions warrant." As a plurality

decision by the Seventh Circuit stated, in response to a similar argument:

> True, the commissioner has discretion in determining how many permits to reissue. But that is the business of government. Not all discretionary decisions implicate the First Amendment.... Since the limited discretion given to the commissioner in Chicago's ordinance does not in any way limit the speech content of the newsstand operator, there is no threat or risk of censorship which violates the First Amendment.

*Graff v. City of Chicago*, 9 F.3d 1309, 1318–19 (7th Cir.1993) (internal citations and quotations omitted).

■ I agree. That the Commissioner has discretion over the total number of permits or whether to issue multiple permits for a single bus stop does not make the ordinance an unconstitutional prior restraint on speech. The concern animating prior restraint doctrine is that of censorship based on content or viewpoint. *Lakewood, supra*, 486 U.S. at 756, 108 S.Ct. 2138. Here, when the city issues a permit, it is unaware of the content of the speech.

Giving the Commissioner discretion to determine the total number of permits and whether to allow more than one bench per bus stop creates no real risk that the "licensing determination [will] be made on the basis of ongoing expression or the words about to be spoken." There is, accordingly, "little danger of censorship." *Id.* at 760–61, 108 S.Ct. 2138; *see also Polaris Amphitheater Concerts, supra*, 267 F.3d at 509 ("[T]he chief concern which animates the doctrine of prior restraint—

---

**2.** Plaintiff also contends that the provision stating that no bench may be installed "until a permit is obtained from the Commissioner ... on forms prescribed by such official," § 719.02(a), vests the Commissioner with unbridled discretion because "the demands of a form can be made very difficult to meet." [Doc. 42, at 15]. Plaintiff does not allege that

the city has imposed onerous requirements with the form. I decline to go so far as to say the city must describe the structure of the permit form in the ordinance. *See Parks, supra*, 385 F.3d at 699 ("There is no statute or regulation imaginable that does not require some degree of interpretation by the agency charged with its enforcement.").

the fear of censorship and thought-control—is not raised by the ordinance's content-neutral regulation of noise.").

The ordinance as a whole contains sufficiently precise language to guide the Commissioner's discretion. To be sure, it leaves room for some judgment, but not all exercises of judgment constitute prior restraints.

### b. Permit Revocation

Finally, plaintiff also argues that the ordinance's revocation provisions in § 719.06 are unconstitutionally vague.[3] Specifically, plaintiff points to the Commissioner's ability to revoke a permit if a bench is "deemed by the Commissioner ... to be a hazard to pedestrian and vehicular traffic or prejudicial to the interest of the general public." § 719.06(e).

■ A statute is unconstitutionally vague if it fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," risks "trapping the innocent," and creates a danger of "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Statutory phrases such as "offensive personality," *U.S. v. Wunsch,* 84 F.3d 1110, 1119 (1996), "con-

duct ... annoying to persons passing by," *Coates v. City of Cincinnati,* 402 U.S. 611, 612–14, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), and "of such character as to be prejudicial to the best interests of the people" *Gelling v. Texas,* 343 U.S. 960, 960, 72 S.Ct. 1002, 96 L.Ed. 1359 (1952) (per curiam) (Frankfurter, J., concurring), have been held unconstitutionally vague.

As discussed above, allowing the Commissioner to determine whether a bench is a safety hazard is not unconstitutionally vague. *See Parks, supra* 385 F.3d at 699; *G.K. Ltd. Travel, supra,* 436 F.3d at 1083.

■ The phrase, "prejudicial to the interest of the general public," is, however, vague. What is deemed prejudicial to the public interest may differ from person to person and the language does not "give a person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned, supra,* 408 U.S. at 108, 92 S.Ct. 2294. As such, it presents a risk of "arbitrary and discriminatory enforcement." *Id.*[4]

As discussed below in Part III, I find that this unconstitutionally vague portion of the statute is severable from the remainder of the ordinance.

---

3. I note that provisions governing revocation of permits do not implicate the prior restraint doctrine, because, by definition, revocation occurs *after* the permit has been issued. *See New England Reg'l Council of Carpenters v. Kinton,* 284 F.3d 9, 25 (1st Cir.2002) (noting that a regulation section allowing revocation of a permit "based on particular conduct" is not a prior restraint on speech "[b]ecause this proviso grants discretion to limit activity at the time it occurs").

4. Plaintiff also argues that the ordinance is unconstitutionally vague because it does not require the Commissioner to provide a reason for denial, nor does it provide for any administrative appeal. Plaintiff seems to suggest that the procedural safeguards enunciated in *Freedman v. Maryland,* 380 U.S. 51, 58–59, 85

S.Ct. 734, 13 L.Ed.2d 649 (1965), are required here. Under the *Freedman* framework a licensing law permitting content-based discrimination must provide for time limits in the licensing process and a procedure for prompt judicial review. *Id.*

More recently, however, in *Thomas v. Chicago Park Dist.,* 534 U.S. 316, 322, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002), the Supreme Court held that these safeguards do not apply to content-neutral time, place and manner regulations. Because the ordinance is content neutral, it need not provide for specific grounds for denial of permit applications, nor must it provide for appeal to a judicial body. *Id.; H.D.V.–Greektown v. City of Detroit,* 568 F.3d 609, 621, 624–25 (6th Cir.2009).

## C. Public Forum

The parties dispute whether the speech at issue here occurs in a public or non-public forum. Plaintiff contends that because the benches are located on sidewalks, they are in a public forum. The city contends that the bus stops themselves are a non-public forum.

■ As a general rule, a governmental entity may limit or restrict speech on its own property without violating the Constitution. *Cornelius v. NAACP Legal Def. & Educ. Fund., Inc.*, 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). The rights of a potential speaker and the authority of the government to limit expression depend, however, on the type of property the speaker seeks to use for expressive purposes.

The Supreme Court has adopted a forum analysis to determine when "the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Id.*

The reach of First Amendment protection depends on whether the governmental property is a traditional public forum, a designated public forum or nonpublic forum. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

■ A "traditional public forum" is a place "which by long tradition or by government fiat ha[s] been devoted to assembly and debate," such as "streets and parks." *Id.* at 45, 103 S.Ct. 948.

Designated public fora are places the state has opened "for use by the public as a place for expressive activity." *Id.*

A non-public forum is public property "which is not by tradition or designation a forum for public communication." *Id.* at 46, 103 S.Ct. 948.

■ Any content-based exclusion in either a traditional or designated public forum is subject to strict scrutiny: to be constitutionally valid as to either such forum, a content-based exclusion must be narrowly drawn to achieve a compelling state interest. *Id.* at 46, 103 S.Ct. 948.

First, I must determine what sort of forum a bus stop bench is. Next, I must determine whether the forum is public or non-public. *Cornelius, supra,* at 801, 105 S.Ct. 3439.

When defining the relevant forum, my "analysis is not completed merely by identifying the government property at issue." *Id.* Instead, "in defining the forum," I focus "on the access sought by the speaker." *Id.*

In this case, plaintiff seeks to place advertising on benches on city sidewalks at bus stops. The forum is thus properly defined as city bus stops on city sidewalks.

Courts generally treat city sidewalks as traditional public fora. *Frisby v. Schultz,* 487 U.S. 474, 481, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (recognizing that "public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum"); *United Church of Christ v. Gateway Econ. Devel. Corp.,* 383 F.3d 449, 452 (6th Cir. 2004) (noting that public sidewalks are "public thoroughfare[s]" and "open to the public for general pedestrian passage.").

A public sidewalk on which a publisher has placed a newsrack constitutes a public forum. *E.g., Gold Coast Publ'ns, Inc. v. Corrigan,* 42 F.3d 1336, 1344 (11th Cir. 1994) (holding that newsracks on public-rights-of-way were located in a traditional public forum); *Jacobsen v. U.S. Postal Serv.,* 993 F.2d 649, 657 (9th Cir.1992) (noting that "[t]o the extent that the newsrack was on the *municipal sidewalk* . . . it was on a public forum."); *Bench Billboard*

*v. City of Cincinnati,* 2008 WL 2220625, *6 (S.D.Ohio 2008) ("In this case, the property is a public sidewalk, also a traditional public forum.").

■ The sidewalks at issue in this case are "public thoroughfare[s]" which are "open to the public for general pedestrian passage," including waiting for the bus. *United Church of Christ, supra,* 383 F.3d at 452. A person would certainly be permitted to hand out leaflets, or hold a sign on the sidewalk near a bus stop. Although a bus bench is a more permanent form of expression, it is still located in a public forum.[5]

I conclude that because plaintiff's benches are located on public city sidewalks, the city, through its permit requirement, is regulating speech that may take place on the sidewalk. Therefore, traditional public forum analysis is appropriate.

Because the benches are on a traditional public forum, the city may limit their installation only by content-based restrictions that satisfy strict scrutiny and reasonable, content-neutral time, place, and manner restrictions. *Perry, supra,* 460 U.S. at 45, 103 S.Ct. 948.

## D. Prohibition on Political Speech

Plaintiff facially challenges the constitutionality of the ordinance's ban on political speech. The city's justification in response is that the ordinance "insures that the City remains neutral on political issues, because it bans all political advertising." [Doc. 39, at 3].[6] Beyond this bare allegation, the city has submitted no evidence or testimony supporting the political speech ban. No city official provided any reason why the city treats political speech differently than other speech.

■ Political speech is "entitled to the fullest possible measure of constitutional protection." *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 816, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), and a "content-based regulation of political speech in a public forum is valid only if it can survive strict scrutiny." *Burson v. Freeman,* 504 U.S. 191, 197 n. 3, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992).

■ Even assuming *arguendo* that a city's interest in maintaining political neutrality is a compelling governmental interest, the city has not shown that the prohibition of political signs on bus benches is

**5.** The Sixth Circuit, in *Chabad of Southern Ohio & Congregation Lubavitch v. City of Cincinnati,* 363 F.3d 427, 434 (6th Cir.2004), evaluated the City of Cincinnati's argument that plaintiff had "no free speech right to leave an unattended private structure on public property." The court concluded that, because the property at issue—a public square—was a traditional public forum, and the city expressly authorized expressive activity on the property with a permit, the plaintiff had a First Amendment right to leave an unattended private structure subject to reasonable time, place and manner restrictions. The court noted that while a blanket ban on unattended structures in a public forum might be permissible, Cincinnati's ordinance did not implement a blanket ban, but rather explicitly permitted expressive activity. *Id.*

While the city in this case does not argue that plaintiff has no First Amendment right to place a structure on public property, *Chabad* is instructive because it explains that the right to leave a structure on public property depends on both the property itself, and the government's regulation of that property. Here, the city of Toledo has expressly allowed courtesy benches to be placed on its sidewalks, which are a traditional public forum.

**6.** The city's primary response to plaintiff's challenge to the political speech ban is that the benches are a non-public forum and therefore the regulation need only be reasonable. As discussed above, I find that public forum analysis is appropriate.

narrowly tailored to serve that interest. The city has not alleged that banning political advertisements on bus benches furthers the city's interest in maintaining politically neutrality, namely, it has made no allegation that political advertising on private bus benches would be in any way attributed to the city.

The city has not satisfied its burden to show that the ban on political speech is narrowly tailored to serve a compelling state interest. As I discuss below in Part III, the prohibition on political speech is severable from the remainder of the ordinance.

### E. Prohibition of Certain Words

Plaintiff also challenges the ordinance's ban on the use of the words: "STOP," "LOOK," "DRIVE–IN," "DANGER," "or any other word or words which might mislead or distract traffic." § 719.08. These are content-based restrictions on commercial speech.

■■■ Commercial speech encompasses "expression related solely to the economic interests of the speaker and its audience" and "speech proposing a commercial transaction." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 493, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995). Restrictions on commercial speech are governed by the four-part test in *Central Hudson Gas and Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). First, the commercial speech must concern lawful activities and not be misleading. *Id.* at 563–64, 100 S.Ct. 2343. Second, the government must establish a substantial interest in support of the regulation. *Id.* at 564, 100 S.Ct. 2343.

■■■ Third, the proposed restriction or regulation must directly and materially advance the substantial government interest. *Id.* The government has the burden to "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Fla. Bar. v. Went For It, Inc.*, 515 U.S. 618, 625–26, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995). To meet this burden, the government "must come forward with some quantum of evidence, beyond its own belief in the necessity of the regulation, that the harms it seeks to remedy are concrete and that its regulatory regime advances the stated goals." *Pagan v. Fruchey*, 492 F.3d 766, 770 (6th Cir.2007).

■■■ Finally, the regulation must be narrowly tailored to achieve the government's desired result: "if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." *Cent. Hudson Gas & Elec. Corp.*, *supra*, 447 U.S. at 564, 100 S.Ct. 2343. The burden to establish a "reasonable fit" between the government's substantial interest and the ordinance provision rests with the government. *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 416, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993).

In the instant case, there is no argument that plaintiff's bench advertisements are unlawful or misleading. Second, the city's interest in prohibiting certain words—traffic safety—is a substantial government interest. *Metromedia*, *supra*, 453 U.S. at 507–08, 101 S.Ct. 2882.

Plaintiff primarily argues the third and fourth prongs of *Central Hudson* are not satisfied here. First, plaintiff argues that under *Pagan*, *supra*, 492 F.3d at 771, the city must "come forward with some quantum of evidence, beyond its own belief in the necessity for regulation, that the harms it seeks to remedy are concrete and that its regulatory regime advances the stated goals."

In *Pagan* the defendant village failed to meet its burden. In that case a village official's affidavit stated the government's interest in traffic safety justified a ban on "For Sale" signs in cars parked on public streets. The court held that such purpose did not directly and materially advances a substantial government interest. *Id.* at 772–73.

The court in *Pagan,* however, explicitly distinguished billboard regulation as addressed by *Metromedia:*

> The plurality [in *Metromedia* ] recited at some length the Court's many summary rulings upholding billboard restrictions, referred to the history of billboards, and generally emphasized the frequency with which governments had placed restrictions on billboards. The plurality ultimately concluded, "[w]e likewise hesitate to disagree with the accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety." *Id.* at 509, 101 S.Ct. 2882. Thus, *Metromedia* looked to its own substitute for the sort of evidence *Edenfield* [*v. Fane,* 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) ] requires-the collective judgment of many legislative and judicial decision-makers. No similar substitute exists here.

492 F.3d at 774–75 (quoting *Metromedia, supra,* 453 U.S. at 509, 101 S.Ct. 2882).

■ The rationale—the risk of distracting drivers—for permitting local governments to regulate billboards for traffic safety purposes is the same for bench billboards. That risk justifies the regulation's prohibition against use of certain words, which are often associated with advances

the government's substantial interest in traffic safety.

Finally, I find that there is a "reasonable fit," *Discovery Network, supra,* 507 U.S. at 416, 113 S.Ct. 1505, between the city's interest in traffic safety and prohibiting the designated words, "stop," "look," "drive-in," "danger" and "any other word or words which might mislead or distract traffic." § 719.08.[7] As Zervos testified, a sign with the words "drive in" "could indicate that that was a place to leave the street and go onto the property ... It could be construed as a sign indicating that the next approach opening in the curb might be a spot to turn, it could be misleading." [Doc. 30, at 55]. Zervos testified that the other words listed are similarly potentially "distracting" or "misleading." *Id.* at 55–56.

While all signs along a roadway are somewhat distracting, Zervos testified that "[w]hen one considers that these are on courtesy benches in an urban environment, where traffic is more stop and go as opposed to a rural area, a distraction in the latter cases is minute, but in an urban area where bus stops and bus transits are required, they are far more dangerous." *Id.* at 56–57.

This aspect of the ordinance passes constitutional muster.

### F. Bench Maintenance and Litter Requirements

Plaintiff also argues that the ordinance's requirement that licensees affix a trash can to the bench and remove ice, snow, litter and debris from the benches and the area around them violates the First Amendment.

---

7. Plaintiff also argues that the wording: "any other word or words which might mislead or direct traffic" is vague. I disagree. As with plaintiff's challenge to the public safety haz- ard language discussed previously, I find this language sufficiently specific. *See Parks, supra,* 385 F.3d at 699.

■ "Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." *Ward, supra,* 491 U.S. at 791, 109 S.Ct. 2746.

■ The parties do not dispute that this provision of the ordinance is content neutral. The *Thomas* standard applies to content neutral time, place and manner restrictions that impose an incidental burden on speech. 534 U.S. at 323, 122 S.Ct. 775; *see also H.D.V.–Greektown, supra,* 568 F.3d at 621–22.[8] In addition to being content neutral, the ordinance must: 1) contain adequate standards to guide the official's discretion; 2) be narrowly tailored to serve a significant government interest; and 3) leave open ample alternatives for communication. *Thomas, supra,* 534 U.S. at 323 n. 3, 122 S.Ct. 775. The government bears the burden of proving that its regulation meets this standard. *U.S. v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000).

As the Supreme Court explained in *City of Ladue, supra,* billboards and visual signs pose "distinctive problems" and have long been subject to the "police powers" of cities because they "take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation." 512 U.S. at 48, 114 S.Ct. 2038. It thus is "common ground that government may regulate the physical characteristics" of signs and billboards in much the same way that "they can, within reasonable bounds and absent censorial purpose, reg-

ulate audible expression in its capacity as noise." *Id.*

■ These provisions of the ordinance do not limit the speech itself, but limit the conditions under which that speech may occur. This portion of the ordinance contains adequate standards to guide the Commissioner's discretion.

### 1. Governmental Interest

The city's asserted interests in the bench maintenance, trash can and litter clean-up requirements are safety and aesthetics. Plaintiff asserts that the city's actions in only targeting courtesy benches and not other sidewalk structures shows that these interests are insignificant.

Safety and aesthetics have long been recognized as significant governmental interests. *Metromedia, supra,* 453 U.S. at 507–08, 101 S.Ct. 2882; *see also Discovery Network, supra,* 507 U.S. at 425, 113 S.Ct. 1505; *H.D.V.–Greektown, supra,* 568 F.3d at 623 ("[G]oals such as aesthetics and safety are legitimate governmental interests"). I therefore find that the city has asserted a significant interest.

### 2. Narrow Tailoring

To be narrowly tailored, a regulation must "promote[ ] a substantial government interest that would be achieved less effectively absent the regulation" and "the means chosen [must not be] substantially broader than necessary to achieve the government's interest." *Ward, supra,* 491 U.S. at 799–800, 109 S.Ct. 2746 (internal quotation and citation omitted). Narrow tailoring does not, however, require the government to use the least restrictive means. *Id.* at 800, 109 S.Ct. 2746 ("[T]he

---

**8.** Plaintiff analyzes this provision as a regulation of commercial speech. I find, however, that it is appropriately analyzed as a content neutral time, place and manner restriction on speech. *See Prime Media I, supra,* 398 F.3d at 824 (analyzing an ordinance restricting the size of commercial billboards as a time, place and manner restriction and noting that the "framework for analyzing regulations of commercial speech [ ] is 'substantially similar' to the test for time, place, and manner restrictions") (internal citations omitted).

regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less restrictive alternative.").

Plaintiff argues that the ordinance is not narrowly tailored because: 1) courtesy benches do not cause or contribute to the city's litter problem; 2) the burden to comply will be cost-prohibitive to plaintiff; and 3) the ordinance does not govern benches installed by TARTA at several bus stops. Plaintiff essentially argues that because the ordinance does not generally target litter on city right-of-ways, but only addresses litter in certain locations, it is not narrowly tailored.

The Sixth Circuit in *Wheeler v. Comm'r of Highways*, 822 F.2d 586, 595 (1987), upheld a ban on some advertising signs but not others. As the court in *Prime Media I, supra*, 398 F.3d at 821, explained:

> *Wheeler* rejected an argument that a ban on certain types of advertising signs was not sufficiently tailored because, by permitting other types of signs, the ban did not completely achieve the interests of aesthetics and traffic safety. Finding that such an incomplete (yet content-neutral) ban nonetheless directly advanced legitimate interests, the court concluded that the ban satisfied time-place-and-manner scrutiny.

The regulations imposed on courtesy bench owners directly advance the city's interest in safety and aesthetics by requiring courtesy bench owners to maintain the area around their benches. That the city's regulation does not "completely achieve" these interests—such as by requiring anyone placing any advertising near a city street, or anyone providing a place where people congregate to maintain the area—does change the fact that the regulation is narrowly tailored.

The government's substantial interests in ensuring that litter is kept off of city streets and in pedestrian safety "would be achieved less effectively absent the regulation." *Ward, supra*, 491 U.S. at 799, 109 S.Ct. 2746. The provision thus satisfies the narrow tailoring requirement.

### 3. Ample Alternatives

As the court in *Prime Media I, supra*, 398 F.3d at 819 (internal quotation and citations omitted), noted with regard to size limitations on billboards: "the regulations leave open ample alternative communication because they permit billboards that satisfy the . . . restrictions . . . and do not affect any individual's freedom to exercise the right to speak and distribute literature in the same place where the posting of signs on public property is prohibited."

The same is true here. Persons wishing to express themselves near bus stops may still do so on bench billboards that comply with the city's regulations, and may still speak in other manners.

I therefore find that the city's regulation is a legitimate time, place and manner restriction on speech and summary judgment is granted to the city on this claim.

### II. Equal Protection

Plaintiff asserts an equal protection challenge to the ordinance, claiming it is treated differently than other bench billboard companies, TARTA, and other modes of communication which the city allows on its sidewalks and other areas adjacent to its streets.

A law challenged on equal protection grounds is subject to rational basis review if plaintiff is not a member of a protected class and no fundamental right is implicated. *Midkiff v. Adams Cty. Reg'l Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005). Under rational basis review, "a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be up-

held against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).

Although equal protection claims typically arise where a person claims discrimination based on membership in a class, the Supreme Court also recognizes equal protection claims by a "class of one" where the plaintiff "alleges that [it] has been treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

■ Under a "class of one" theory, "plaintiff may demonstrate that government action lacks a rational basis either by negativing every conceivable basis which might support the government action, or by showing that the challenged action was motivated by animus or ill-will." *Tri-Health, Inc. v. Bd. of Comm'rs,* 430 F.3d 783, 788 (6th Cir.2005) (citing *Warren v. City of Athens,* 411 F.3d 697, 710–11 (6th Cir.2005)); *see also Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir.2005) (*overruled on other grounds by Appel v. Spiridon,* 531 F.3d 138, 139–40 (2d Cir.2008)) (holding that a class-of-one plaintiff must show that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy").

## A. Similarly Situated

To prevail on its equal protection claim, plaintiff must first show that it has been treated differently than other similarly situated entities. *Braun v. Ann Arbor Charter Twp.,* 519 F.3d 564, 575 (6th Cir.2008). Plaintiff must establish that it and the other entities it alleges were treated differently "were similarly situated in all material respects." *Taylor Acquisitions, LLC v. City of Taylor,* 313 Fed.Appx. 826, 836 (6th Cir.2009).

■ First, I find plaintiff is not similarly situated to newsracks, utility poles used for advertising, ground signs, restaurant and bar sidewalk seating, street banners, and other non-bench items on or near sidewalks. The city's asserted interests are in aesthetics—ensuring that litter is picked up—and safety. As Kroma and Zervos testified, people tend to congregate around bus stops and therefore the ordinance targets courtesy benches at bus stops.

Second, I find that both TARTA benches and other courtesy bench providers are similarly situated to plaintiff "in all material respects." *Taylor Acquisitions, supra,* 313 Fed.Appx. at 836. Both provide a location where people congregate while waiting for the bus, thereby potentially increasing the amount of litter present. City officials testified that the ordinance targets benches specifically because the city noticed accumulation of litter around benches, and had received some complaints.

The relevant question is thus whether the city treats TARTA and other courtesy bench providers differently and, if so, whether there is a rational basis for the distinction.

Plaintiff claims that the city issued permits to another courtesy bench company, Affordable Bench, even though its benches were not in compliance. Plaintiff also points out that the city cited it criminally for non-compliance and Affordable Bench was not. Second, plaintiff alleges that the city treats TARTA more favorably because TARTA benches at bus stops are not sub-

ject to the same litter and snow removal requirements.

## B. Rational Basis

■ Under rational basis scrutiny, government action amounts to a constitutional violation only if it "is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational." *Warren, supra,* 411 F.3d at 711.

"[A] statute or regulation is not lacking in a rational basis simply because it addresses a broader problem in small or incremental stages." *Medeiros v. Vincent,* 431 F.3d 25, 31–32 (1st Cir.2005) (citing *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976)). "[A] State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality." *Dallas v. Stanglin,* 490 U.S. 19, 26, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989) (internal quotations omitted). "It is no requirement of equal protection that all evils of the same genus be eradicated or none at all." *Railway Express Agency v. People of State of New York,* 336 U.S. 106, 110, 69 S.Ct. 463, 93 L.Ed. 533 (1949).

> As the Supreme Court explained:
> Whether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state

of facts that could provide a rational basis for the classification ... Where there are "plausible reasons" for Congress' action, "our inquiry is at an end."

*Beach Commc'ns, supra,* 508 U.S. at 313–14, 113 S.Ct. 2096.

■ Finally, "[u]nder rational basis review, Defendant need not offer any rational basis so long as this Court can conceive of one." *Club Italia Soccer & Sports Org., Inc. v. Charter Tp. of Shelby,* 470 F.3d 286, 299 (6th Cir.2006).

The city asserts that Chapters 963 and 1361 of the Toledo Municipal Code subject TARTA to requirements similar to those applicable to plaintiff under Chapter 719. The city's asserted rational basis, thus, for not subjecting TARTA to the ordinance is that TARTA is governed by similar requirements elsewhere in the code.

■ Plaintiff disputes that these ordinances govern TARTA and contends that even if they do, those ordinances do not impose identical requirements—namely the requirement of an attached trash can and snow and ice removal—on TARTA. I find it unnecessary to reach this dispute as I find plaintiff has failed to negate every "conceivable" rational basis for any differential treatment. *TriHealth, supra,* 430 F.3d at 788.

The city can rationally distinguish between a taxpayer-funded organization primarily providing public transportation, and incidentally providing benches for the convenience of its patrons and private, for-profit corporations in the business of creating a platform on which others can purchase space for their advertisements. Given the importance of low-cost public transportation, the city rationally can impose lesser restrictions on the public operator of its transit system than on others

not in the business of providing a similarly essential public service.

The ordinance "is not lacking in a rational basis simply because it addresses [the] broader problem [of litter and public safety] in small or incremental stages." *Medeiros, supra,* 431 F.3d at 31–32 (1st Cir. 2005). I cannot say that the action "is so unrelated to the achievement of any combination of legitimate purposes" so as to conclude that "the government's actions were irrational." *Warren, supra,* 411 F.3d at 711. Plaintiffs have therefore not negated "every conceivable basis which *might* support" the distinction. *Tri-Health, supra,* 430 F.3d at 788 (emphasis added).

Plaintiff also contends that the city treated one of its competitors, Affordable Bench, more favorably than plaintiff by issuing permits to Affordable Bench even though its benches, like plaintiff's, did not comply with the ordinance.

■■■ Unlike the plaintiff, Affordable Bench has agreed to comply with the ordinance and begun attaching trash receptacles to its benches. There is, therefore, a rational basis for issuing permits to Affordable Bench but not to plaintiff.[9]

Plaintiff fails to show an equal protection violation. The city is entitled to summary judgment as to this claim.[10]

## III. Severability

Because I find two provisions of the ordinance unconstitutional—1) the ban on political advertising in § 719.08(a); and 2) the portion allowing for revocation of a permit if it is "prejudicial to the interest of the general public" in § 719.06(d)—I must determine whether these provisions are severable from the remainder of the ordinance.

As the Supreme Court summarized in *Ayotte v. Planned Parenthood,* 546 U.S. 320, 328–29, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006):

> Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force, see *United States v. Raines,* 362 U.S. 17, 20–22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960), or to sever its problematic portions while leaving the remainder intact, *United States v. Booker,* 543 U.S. 220, 227–229, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

■■■ "Severability of a local ordinance is a question of state law." *Lakewood, supra,* 486 U.S. at 772, 108 S.Ct. 2138. To sever "a portion of a statute, [I] must first find that such severance will not fundamentally disrupt the statutory scheme of which the unconstitutional provision is a part." *State ex rel. Maurer v. Sheward,* 71 Ohio St.3d 513, 523, 644 N.E.2d 369 (1994). Ohio has established a three-part inquiry to determine whether severance is appropriate:

---

9. Plaintiff also contends that the differential treatment of Affordable Bench and the enactment of the ordinance itself demonstrates the city's action is motivated by animus toward plaintiff. Because I find there is a rational basis for the city's actions, however, I find that plaintiff cannot show these actions were motivated by animus or ill-will. *See, e.g., Club Italia Soccer, supra,* 470 F.3d at 298 (noting that "show[ing] that Defendant was motivated by animus ... is impossible where Defendant's actions have a very clear rational basis").

10. In its complaint, plaintiff also alleges a due process violation. Plaintiff, however, has offered no argument in support of this claim and nothing to suggest that it is separate from its equal protection claim.

(1) Are the constitutional and the unconstitutional parts capable of separation so that each may be read and may stand by itself? (2) Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out? (3) Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only?

*State v. Hochhausler*, 76 Ohio St.3d 455, 464–65, 668 N.E.2d 457 (1996) (internal quotation marks omitted).

The intent of the city council—allowing for courtesy benches while at the same time placing some restrictions on when and where the benches can be placed—can be maintained even when the offending provisions are stricken.

No words or terms need be added to separate the unconstitutional provisions from the constitutional portions of Chapter 719 or to give meaning to the constitutional provisions. *See, e.g., Norwood v. Horney*, 110 Ohio St.3d 353, 389, 853 N.E.2d 1115 (2006); *State ex rel. Maurer, supra*, 71 Ohio St.3d at 524, 644 N.E.2d 369.

██ I therefore conclude that the two unconstitutional provisions of the city ordinance are severable from the remainder of Chapter 719. These two provisions are therefore severed, and the rest of Chapter 719 remains in force.

### IV. Freestanding § 1983 Claim

Plaintiff's fifth claim for relief alleges a separate claim under 42 U.S.C. § 1983. Plaintiff concedes that § 1983 does not create substantive rights. This freestanding claim is therefore dismissed, though I recognize that plaintiff's constitutional claims are brought under § 1983.

### V. Tortious Interference

Plaintiff alleges a claim for tortious interference with prospective economic relationships. In its opposition, however, plaintiff concedes that it does not have a tortious interference claim against the city at this time because the city has not confiscated any of plaintiff's benches. This claim is therefore also dismissed.

### Conclusion

For the foregoing reasons, it is hereby:

ORDERED THAT:

1. The ordinance's prohibition on political speech in § 719.08(a) and allowance of revocation based on a finding that the bench is "prejudicial to the interest of the general public," in § 719.06(d) are unconstitutional. Defendant is enjoined from enforcing these provisions.

2. Plaintiff's motion for summary judgment [Doc. 32] is therefore granted as to the ordinance's prohibition on political speech and allowance of revocation based on a finding that the bench is "prejudicial to the interest of the general public," and denied as to its other claims.

3. Defendant's motion for summary judgment [Doc. 21] is therefore denied as to as to plaintiff's challenge to the ordinance's prohibition on political speech and allowance of revocation based on a finding that the bench is "prejudicial to the interest of the general public," and granted as to its other claims.